# SMITH v. ST. LOUIS AND SOUTHWESTERN RAIL-WAY COMPANY.

ERROR TO THE COURT OF CIVIL APPEALS OF THE SECOND SUPREME
JUDICIAL DISTRICT OF THE STATE OF TEXAS.

No. 155.   Submitted January 31, 1901.—Decided April 22, 1901.

Article 5043c of the Revised Statutes of Texas, 1895, provides: "It shall
be the duty of the commission provided for in article 5043a to protect
the domestic animals of this State from all contagious or infectious dis-
eases of a malignant character, whether said diseases exist·in Texas
or elsewhere; and for this purpose they are hereby authorized and em-
powered to establish, maintain and enforce such quarantine lines and
sanitary rules and regulations as they may deem necessary.   It shall
also be the duty of said commission to coöperate with live stock quar-
antine commissioners and officers of ·other States and Territories, and
with the United States Secretary of Agriculture, in establishing such
interstate quarantine lines, rules and regulations as shall best protect
the live stock industry of this State against Texas or splenetic fever.
It shall be the duty of said commission, upon receipt by them of reliable
information of the existence among the domestic animals of the State of
any malignant disease, to go at once to the place where any such disease
is alleged to exist, and make a careful examination of the animals be-
lieved to be affected with any such disease, and ascertain, if possible,
what, if any, disease exists among the live stock reported to be affected,
and whether the same is contagious or infectious, and if said disease is
found to be of a malignant, contagious or infectious character, they shall
direct and enforce such quarantine lines and sanitary regulations as are
necessary to prevent the spread of any such disease.   And no·domestic
animals infected with disease or capable of communicating the same,
shall be permitted to enter or leave the district, premises or grounds so
quarantined, except by authority of the commissioners.   The said com-
mission shall also, from time to time, give and enforce such directions
and prescribe such rules and regulations as to separating, feeding and
caring for such diseased and exposed animals as they shall deem neces-
sary to prevent the animals so affected with such disease from coming in
contact with other animals not so affected.   And the said commissioners
are hereby authorized and empowered to enter upon any grounds or
premises to carry out the provisions of this act."   Held, that this stat-
ute, as construed and applied, in this case, is not in conflict with the
Constitution of the United States.

The prevention of disease is the essence of a quarantine law.   Such law is

directed not only to the actually diseased, but to what has become exposed to disease.

THIS case involves the constitutionality of certain quarantine regulations of the State of Texas. The laws of Texas provide for the creation of a Live Stock Sanitary Commission, consisting of three members appointed by the Governor, and prescribe their duty. The particular provisions which are material to the case are inserted in the margin.[1]

The Governor of the State issued the following proclamation:

"Whereas, the Live Stock Sanitary Commission of Texas

---

[1] Article 5043c of the Revised Statutes, 1895, provides: "It shall be the duty of the commission provided for in article 5043a to protect the domestic animals of this State from all contagious or infectious diseases of a malignant character, whether said diseases exist in Texas or elsewhere; and for this purpose they are hereby authorized and empowered to establish, maintain and enforce such quarantine lines and sanitary rules and regulations as they may deem necessary. It shall also be the duty of said commission to coöperate with live stock quarantine commissioners and officers of other States and Territories, and with the United States Secretary of Agriculture, in establishing such interstate quarantine lines, rules and regulations as shall best protect the live stock industry of this State against Texas or splenetic fever. It shall be the duty of said commission, upon receipt by them of reliable information of the existence among the domestic animals of the State of any malignant disease, to go at once to the place where any such disease is alleged to exist, and make a careful examination of the animals believed to be affected with any such disease, and ascertain, if possible, what, if any, disease exists among the live stock reported to be affected, and whether the same is contagious or infectious, and if said disease is found to be of a malignant, contagious or infectious character, they shall direct and enforce such quarantine lines and sanitary regulations as are necessary to prevent the spread of any such disease. And no domestic animals infected with disease or capable of communicating the same, shall be permitted to enter or leave the district, premises or grounds so quarantined, except by authority of the commissioners. The said commission shall also, from time to time, give and enforce such directions and prescribe such rules and regulations as to separating, feeding and caring for such diseased and exposed animals as they shall deem necessary to prevent the animals so affected with such disease from coming in contact with other animals not so affected. And the said commissioners are hereby authorized and empowered to enter upon any grounds or premises to carry out the provisions of this act."

has this day recommended the adoption of the following regulations:

"'The Live Stock Sanitary Commission of the State of Texas have been reliably informed that the cattle, mules and horses in the southern portion of Jefferson County, State of Texas, are affected with disease, known as charbon or anthrax, and are liable to impart such disease to cattle, mules and horses ranging in upper portion of Jefferson and other counties, from this time forth to the 15th day of November, 1897, no cattle, mules or horses are to be transported or driven north or west of Taylor and Salt bayous, said bayous running across the southern portion of Jefferson County, State of Texas. This order is given for the purpose of quarantining all cattle, mules and horses south and east of said Taylor and Salt bayous. The Texas Live Stock Commission has reason to believe that charbon or anthrax has or is liable to break out in the State of Louisiana, from this time forth until the 15th day of November, 1897, no cattle, mules or horses are to be transported or driven into the State of Texas from the State of Louisiana. The Live Stock Sanitary Commission of the State of Texas hereby order that any violation of any of the aforesaid rules and regulations by moving of any cattle, mules or horses north of said bayous, or out of Louisiana into the State of Texas, is contrary to said rules and regulations, and shall be an offence and punishable as provided by the laws of the State of Texas:'

"Now, therefore, I, C. A. Culberson, Governor of Texas, in conformity with the provisions of chapter 7, title 102, of the Revised Statutes of Texas of 1895, do hereby declare that the quarantine lines, rules and regulations set forth in the above-recited order of the Live Stock Sanitary Commission of Texas shall be in full force and effect from and after this date.

"In witness whereof, I have hereunto set my hand, and caused the seal of the State to be affixed, at Austin, this 5th day of June, A. D. 1897.'

"C. A. Culberson,
"*Governor of Texas.*"

In consequence of this proclamation the railway company

refused to deliver certain, cattle to their owners, of whom the plaintiff in error was one, which it had received as freight from a connecting carrier, and which had been delivered to the latter in the State of Louisiana. The facts, or as many of them as is necessary to state, are as follows:

The shipment of cattle was made upon a through bill of lading issued by the St. Louis and Southwestern Railway Company, at Plain Dealing, La., for Fort Worth, Tarrant County, Texas, and was a through and continuous shipment. The cattle arrived at Fort Worth on the 28th of August, 1897. The owners were ready to receive them, and tendered the amount of freight due thereon. The tender was rejected, and the delivery of the cattle refused. The cattle remained in the pens of the plaintiff in error, the stockyards at Fort Worth refusing to receive them on account of the proclamation of the Governor, and permission, which was asked by the railway company of the Live Stock Sanitary Commission, to deliver them to their owners, was also refused on account of the Governor's proclamation. Thereafter the railway company shipped the cattle back to Texarkana, to the line of railway from which they were received, by which line they were returned to Plain Dealing, and there tendered to the shippers, who refused to receive them. Thereupon they were sold, after proper advertising, and the proceeds of the sale, less pasturage at Plain Dealing, were tendered to the owners, which was also refused. At the time of the shipment the Live Stock Sanitary Commission had recommended the adoption of the following regulation with reference to Louisiana cattle:

"The Texas Live Stock Commission has reason to believe that charbon or anthrax has or is liable to break out in the State of Louisiana, and from this time forth until the 15th day of November, 1897, no cattle, mules or horses are to be transported or driven into the State of Texas from the State of Louisiana."

The quarantine established (if valid) was in full force at the time of the shipment of the cattle. The bill of lading contained stipulations as to a measure of damages in case of a total loss of the cattle and other provisions, which, as they do not raise Federal questions, we are not concerned with on this record.

The trial court held that—

" 1. The quarantine regulations above mentioned, established by the Governor of the State, is a regulation of or an interference with interstate commerce, in that its effect is to prohibit the importation of all cattle from the State of Louisiana into the State of Texas, whether affected with or capable of communicating the disease mentioned in said proclamation or not, and is therefore void as being in contravention of section 8 of article 1 of the Constitution of the United States.

" Had the Live Stock Sanitary Commission of the State found upon investigation that charbon or anthrax had broken out among the entire cattle of the State of Louisiana, and that all cattle of the State of Louisiana were liable to communicate either of said diseases to cattle of the State of Texas, and had said proclamation of the Governor been based upon said finding, then I think it would have been in law a police regulation of no greater scope than necessary to the protection of cattle in the State of Texas, and therefore valid, even though it did interfere with interstate commerce."

It also held that the stipulation in the contract of shipment limiting the damages at a fixed sum per head was void, and gave judgment for the actual cash value of the cattle, less freight charges. The judgment amounted to $578.10.

The judgment was reversed by the Court of Civil Appeals, and thereupon the Chief Justice of that court granted this writ of error. Before the commencement of the action the plaintiff in error became the vendee of the interests of the other owners.

*Mr. F. E. Albright* and *Mr. Wallace Hendricks* for plaintiff in error.

*Mr. Samuel H. West* for defendant in error.

Mr. Justice McKenna, after making the foregoing statement, delivered the opinion of the court.

There are other questions in the record besides the Federal

one, upon which the writ of error is based. They seem not to have been earnestly pressed either in the trial court or in the Court of Civil Appeals. They were not passed on by either court. The Court of Civil Appeals, however, said:

"It was shown that appellee's vendors had actual notice of the quarantine, and that appellant had not. It was also shown that after such notice was brought home to appellant it sought permission of the sanitary commission to deliver the cattle. The sanitary commission ruled and ordered otherwise. It has been given power to make rules. It has the power to call upon the sheriff and peace officers to enforce them. It was the duty of such officers to obey the orders of such commission. Our law also provides heavy penalties for a violation of the rules and regulations of the sanitary commission."

It is possible that the court may have concluded that the defence which those facts suggest could not be made by the railway company, and that, notwithstanding, the plaintiff in error could compel the company to receive his cattle and force it to contest the constitutionality of the Texas statute either by resisting the imposition of its penalties or in some other way. At any rate, the court rested its decision on the statute, holding it valid, and it is its judgment which we are called upon to review.

To what extent the police power of a State may be exerted on traffic and intercourse with the State without conflicting with the commerce clause of the Constitution of the United States has not been precisely defined. In the case of *Henderson* v. *Mayor of New York*, 92 U. S. 259, it was held that the statute of the State, which, aiming to secure indemnity against persons coming from foreign countries becoming a charge upon the State, required ship owners to pay a fixed sum for each passenger—that is, to pay for all passengers—not limiting the payment to those who might *actually* become such charge, was void. Whether the statute would have been valid if so limited was not decided.

In *Chy Lung* v. *Freeman et al.*, 92 U. S. 275, a statute declaring the same purpose as the New York statute, and apparently directed against persons mentally and physically infirm,

and against convicted criminals and immoral women, was also declared void, because it imposed conditions on all passengers and invested a discretion in officers which could be exercised against all passengers. The court, by Mr. Justice Miller, said:

" We are not called upon by this statute to decide for or against the right of a State, in the absence of legislation by Congress, to protect herself by necessary and proper laws against paupers and convicted criminals from abroad ; nor to lay down the definite limit of such right if it exists. Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity. · When a state statute, limited to provisions necessary and appropriate to that object alone, shall, in a proper controversy, come before us, it will be time enough to decide that question."

In *Railroad Company* v. *Husen*, 95 U. S. 465, a statute of Missouri which provided that "no Texas, Mexican or Indian cattle shall be driven or otherwise conveyed into or remain in any county in this State between the first day of March and the first day of November in each year by any person whatever," was held to be in conflict with the clause of the Constitution which gives to Congress the power to regulate interstate commerce.

The case was an action for damages against the railroad company for bringing cattle into the State in violation of the act. A distinction was made between a proper and an improper exertion of the police power of the State. The former was confined to the prohibition of actually infected or diseased cattle and to regulations not transcending such prohibition. The statute was held not to be so confined, and hence was declared invalid.

· The relation of the police power of a State and the power of Congress to regulate commerce came up again in *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465. The principle which underlies both powers and the range and operation of those powers was considered. The action was against the railroad company for refusing to transport beer from Chicago to Marshalltown in Iowa. The refusal was attempted to be justified under a statute of Iowa against traffic in intoxicating liquors.

and the conveyance of the same by an express or railway company into the State except under certain conditions. The statute was decided to be a regulation of commerce—to be not within the police power of the State, and therefore void. *Leisy* v. *Hardin*, 135 U. S. 100, is of the same general character, and need not be commented upon. See also *Scott* v. *Donald*, 165 U. S. 58.

In *Schollenberger* v. *Pennsylvania*, 171 U. S. 1, some prior cases were reviewed, and the court, speaking by Mr. Justice Peckham, said:

"The general rule to be deduced from the decisions of this court is that a lawful article of commerce cannot be wholly excluded from importation into a State from another State where it was manufactured or grown. A State has power to regulate the introduction of any article, including a food product, so as to insure purity of the article imported, but such police power does not include the total exclusion even of an article of food.

"In *Minnesota* v. *Barber*, 136 U. S. 313, it was held that an inspection law relating to an article of food was not a rightful exercise of the police power of the State if the inspection prescribed were of such a character or if it were burdened with such conditions as would wholly prevent the introduction of the sound article from other States. This was held in relation to the slaughter of animals whose meat was to be sold as food in the State passing the so-called inspection law. The principle was affirmed in *Brimmer* v. *Rebman*, 138 U. S. 78, and in *Scott* v. *Donald*, 165 U. S. 58, 97."

The exclusion in the case at bar is not as complete as in the cited cases. That, however, makes no difference if it is within their principle, and their principle does not depend upon the number of States which are embraced in the exclusion. It depends upon whether the police power of the State has been exerted beyond its province—exerted to regulate interstate commerce—exerted to exclude, without discrimination, the good and the bad, the healthy and the diseased, and to an extent *beyond what is necessary for any proper quarantine.* The words in italics express an important qualification. The prevention of disease is the essence of a quarantine law. Such law is directed

not only to the actually diseased but to what has become exposed to disease. In *Morgan's Steamship Co. v. Louisiana Board of Health,* 118 U. S. 455, the quarantine system of Louisiana was sustained. It established a quarantine below New Orleans, provided health officers and inspection officers, and fees for them to be paid by the ships detained and inspected. The system was held to be a proper exercise of the police power of the State for the protection of health, though some of its rules amounted to regulations of commerce with foreign nations and among the States. In *Kimmish* v. *Ball,* 129 U. S. 217, certain sections of the laws of Iowa were passed on. One of them imposed a penalty upon any person who should bring into the State any Texas cattle unless they had been wintered at least one winter north of the southern boundary of the State of Missouri or Kansas; or should have in his possession any Texas cattle between the first day of November and the first day of April following. Another section made any person having in his possession such cattle liable for any damages which might accrue from allowing them to run at large, " and thereby spreading the disease among other cattle, known as the Texas fever," and there was besides criminal punishment. The court did not pass upon the first section. In commenting upon the second, some pertinent remarks were made on the facts which justified the statute, and the case of *Railroad Company* v. *Husen, supra,* was explained. It was said that the case "interpreted the law of Missouri as saying to all transportation companies, ' You shall not bring into the State any Texas cattle or any Mexican cattle or Indian cattle between March 1st and December 1st in any year, no matter whether they are free from disease or not, no matter whether they may do an injury to the inhabitants of the State or not; and if you do bring them in, even for the purpose of carrying them through the State without unloading them, you shall be subject to extraordinary liabilities.' p. 473. Such a statute, the court held, was not a quarantine law, nor an inspection law, but a law which interfered with interstate commerce, and therefore invalid. At the same time the court admitted unhesitatingly that a State may pass laws to prevent animals suffering from contagious or infectious diseases from entering

within it. p. 472. No attempt was made to show that all Texas, Mexican, or Indian cattle coming from the malarial districts during the months mentioned were infected with the disease, or that such cattle were so generally infected that it would have been impossible to separate the healthy from the diseased. Had such proof been given, a different question would have been presented for the consideration of the court. Certainly all animals thus infected may be excluded from the State by its laws until they are cured of the disease, or at least until some mode of transporting them without danger of spreading it is devised."

In *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613, the *Husen* case was again commented upon, and what the law of Missouri was and was not was again declared. A statute of Kansas, however, which made any person who shall drive or ship into the State " any cattle liable or capable of communicating Texas, splenetic or Spanish fever to any domestic cattle of the State liable for damages," was held not to be a regulation of commerce. It was also held that the statute was not repugnant to the act of Congress of March 29, 1884, 23 Stat. 31, c. 60, known as the Animal Industry Act.

What, however, is a proper quarantine law—what a proper inspection law in regard to cattle—has not been declared. Under the guise of either a regulation of commerce will not be permitted. Any pretense or masquerade will be disregarded, and the true purpose of a statute ascertained. *Henderson* v. *Mayor of New York*, and *Chy Lung* v. *Freeman, supra.* But we are not now put to any inquiry of that kind. The good faith and sincerity of the Texas officers cannot be doubted, and the statutes under which they acted cannot be justifiably complained of. The regulations prescribed are complained of, but are they not reasonably adaptive to the purpose of the statutes —not in excess of it? Quarantine regulations cannot be the same for cattle as for persons, and must vary with the nature of the disease to be defended against. As the Supreme Court of Tennessee said: "The necessities of such cases often require prompt action. If too long delayed the end to be attained by

the exercise of the power to declare a quarantine may be defeated and irreparable injury done."

It is urged that it does not appear that the action of the Live Stock Sanitary Commission was taken on sufficient information. It does not appear that it was not, and the presumption which the law attaches to the acts of public officers must obtain and prevail. The plaintiff in error relies entirely on abstract right, which he seems to think cannot depend upon any circumstances or be affected by them. This is a radical mistake. It is the character of the circumstances which gives or takes from a law or regulation of quarantine a legal quality. In some cases the circumstance would have to be shown to sustain the quarantine, as was said in *Kimmish* v. *Ball, supra.* But the presumptions of the law are proof, and such presumptions exist in the pending case arising from the provisions of and the duties enjoined by the statute and sanction the action of the sanitary commission and the Governor of the State. If they could have been they should have been met and overcome, and the remarks of the Court of Civil Appeals become pertinent:

"The facts in this case are not disputed. The plaintiff sues as for a conversion, because of a refusal to deliver his cattle at Fort Worth. It is necessary to his recovery that he show that it was the legal duty of the defendant company to make such delivery. It is for the breach of this alleged duty he sues; yet it nowhere appears from the record that before the quarantine line in question was established the sanitary commission did not make the most careful and thorough investigation into the necessity therefor; if, indeed, that matter could in any event be inquired into. So far as the record shows, every animal of the kind prohibited in the State of Louisiana may have been actually affected with charbon or anthrax, and it is conceded that this is a disease different from Texas or splenetic fever, and that it is contagious and infectious and of the most virulent character."

*Judgment affirmed.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE WHITE, dissenting.

I am unable to concur in the opinion and judgment of the court. The grounds of my dissent are these: (1) The railroad company was bound to discharge its duties as a carrier unless relieved therefrom by such quarantine regulations under the laws of Texas as were consistent with the Constitution of the United States. It could not plead in defence of its action the quarantine regulations adopted by the state sanitary commission and the proclamation of the Governor of that State, if such regulations and proclamation were void under the Constitution of the United States. (2) The authority of the State to establish quarantine regulations for the protection of the health of its people does not authorize it to create an embargo upon all commerce involved in the transportation of live stock from Louisiana to Texas. The regulations and the Governor's proclamation upon their face showed the existence of a certain cattle disease in one of the counties of Texas. If under any circumstances that fact could be the basis of an embargo upon the bringing into Texas from Louisiana of all live stock during a prescribed period, those circumstances should have appeared from the regulations and the proclamation referred to. On the contrary there does not appear on the face of the transaction any ground whatever for establishing a complete embargo for any given period upon all transportation of live stock from Louisiana to Texas.

I think therefore that the regulations and proclamation upon which the defendant relied were to be deemed void and therefore inapplicable to the particular transportation referred to in the complaint.

It seems to me that the present case comes within the principles announced in *Henderson* v. *Mayor of New York*, 92 U. S. 259. That case involved the validity of a statute of New York having for its object the protection of the people of that State against the immigration of foreign paupers. It was held by this court to be unconstitutional, because "its practical result was to impose a burden upon *all* passengers from foreign coun-

tries." In that case it was said that in whatever language a statute was framed, its purpose must be determined by its natural and reasonable effect. So also in *Railroad Co.* v. *Husen,* 95 U. S. 465, 473, we held that a statute of Missouri relating to the bringing into that State of any Texas, Mexican or Indian cattle between certain dates was a plain intrusion upon the exclusive domain of Congress. This court said : " It is not a quarantine law. It is not an inspection law. It says to all natural persons and to all transportation companies, ' You shall not bring into the State any Texas cattle or any Mexican cattle or Indian cattle, between March 1st and December 1st in any year, no matter whether they are free from disease or not, no matter whether they may do an injury to the inhabitants of the State or not; and if you do bring them in, even for the purpose of carrying them through the State without unloading them, you shall be subject to extraordinary liabilities.' Such a statute, we do not doubt, is beyond the power of a State to enact. To hold otherwise would be to ignore one of the leading objects which the Constitution of the United States was designed to secure." What was said of the Missouri statute may be repeated as to the regulations adopted by the Sanitary Commission and the proclamation of the Governor of Texas forbidding the bringing of cattle into that State from Louisiana. The result in my judgment is, in view of our former decisions, that the quarantine regulations and proclamation in question involved, by their natural and practical operation, an unauthorized obstruction to the freedom of interstate commerce. This must be so, even if the statute of Texas, reasonably interpreted, was itself not repugnant to the Constitution of the United States.

MR. JUSTICE WHITE authorizes me to say that he concurs in these views.

MR. JUSTICE BROWN, dissenting.

The law of Texas for the creation of a live stock sanitary commission, cited in the opinion of the court, provides that " it

shall be the duty of said commission, upon receipt by them of reliable information, . . . of any malignant disease, to go . . . and make a careful examination of the animals believed to be affected, . . . and if said disease is found to be of a malignant, contagious or infectious character, they shall direct and enforce such quarantine lines and sanitary regulations as are necessary to prevent the spread of any such disease. And no domestic animals affected with disease, or capable of communicating the same, shall be permitted to enter or leave the district, premises or grounds so quarantined, except by authority of the commissioners."

I had supposed the authority of the commissioners to be fixed by this act, and their right to quarantine or forbid the entry of animals was limited to such as were infected with disease or capable of communicating the same.

The proclamation of the Governor, based upon the report of the sanitary commission, covers two separate classes of cases. It finds that cattle in the southern portion of Jefferson County, Texas, are affected with disease and liable to impart such disease to cattle ranging in the upper portion of Jefferson and other counties, and therefore forbids such cattle from being transported north or west of certain bayous running across the southern portion of Jefferson County. So far the order is within the statute.

But it also finds that the commission "has reason to believe that charbon and anthrax has [broken out] or is liable to break out in the State of Louisiana," and hence that no cattle are to be transported into Texas from Louisiana. This portion of the order seems to me a plain departure from the terms of the statute. It does not find that there are cattle in Louisiana "infected with disease or capable of communicating the same," but simply that the disease is liable to break out in that State. It does not even find that it has broken out, or that there are any cattle in that State capable of communicating the disease. If the fact that a contagious disease is liable to break out in a certain locality be sufficient to justify a quarantine against such locality, then it is possible that every port of the United States may quarantine against Cuban or other West Indian ports,

since it is a well-known fact that yellow fever is liable to break out there at almost any time, and especially during the summer months.

The sweeping nature of this order is manifest by comparing it with the first order relating to the Jefferson County cattle. There is a finding there that the cattle in the southern portion of a particular county "are affected with disease, known as charbon or anthrax, and are liable to impart such disease to cattle" ranging in the upper portion of Jefferson County, and therefore no cattle shall be transported north or west of the infected district. In other words, it finds the actual existence of disease within a definite and circumscribed locality, and prohibits the transportation of cattle from such locality to non-infected districts.

On the other hand, the second order assumes to quarantine against cattle from the entire State of Louisiana, without any finding that the disease has broken out there, or that the cattle in such State are liable to communicate such disease to other cattle. The order is not limited to cattle coming from any particular portion of the State, but applies to the whole State, regardless of the actual existence of the disease or the liability to communicate contagion.

It seems to me that the proclamation goes far beyond the authority of the statute, beyond the necessities of the case, and is a wholly unjustifiable interference with interstate commerce. The statute thus construed puts a power into the hands of a sanitary commission which is liable to be greatly abused and to be put forward as an excuse for keeping out of Texas perfectly healthy animals from other States, and putting a complete stop to a large trade.

In the case of the *Missouri, Kansas & Texas Railway* v. *Haber,* 169 U. S. 613, the statute of Kansas in question applied only to "cattle capable of communicating, or liable to impart what is known as Texas, splenetic or Spanish fever to any domestic cattle" of the State, and was a proper exercise of the power of quarantine, since healthy cattle were not interfered with. These were substantially the terms of the Texas statute, to which I see no objection; but the action of the commission

) MR. JUSTICE BROWN, dissenting.

was a plain departure from the terms of the statute, and I think unauthorized by law. It was practically as sweeping as the statute of Missouri, condemned by this court in *Railroad Co.* v. *Husen,* 95 U. S. 465, which provided that " no Texas, Mexican or Indian cattle shall be driven or otherwise conveyed into, or remain, in any county in this State, between the first day of March and the first day of November in each year, by any person or persons whatever," regardless of the fact whether these cattle were diseased or were capable of communicating disease. This was held to be in conflict with the interstate commerce clause of the Constitution. As justly observed of the opinion in that case by the court in its opinion in this case, " a distinction was made between a proper and an improper exertion of the police power of the State. The former was confined to the prohibition of actually infected or diseased cattle; and to regulations not transcending such prohibition. The statute was held not to be so confined, and hence was declared invalid." This is the precise objection I make to the finding of the commission, and to the proclamation of the Governor in this case.

It is sufficient to say of the finding of the Supreme Court of Texas that " so far as the record shows, every animal of the kind prohibited in the State of Louisiana may have been actually affected with charbon or anthrax," that there is no such finding in the report of the commission or in the Governor's proclamation, and that, under the statute, there must be a finding either of disease, or of a liability to communicate disease, to justify the action of the commission. It cannot of its own motion put in force the quarantine laws of the State without the finding of some facts that such enforcement is necessary to the protection of Texas cattle. I am therefore constrained to dissent from the opinion of the court.